UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No.   4:12CR128 CEJ NAB |
| | ) | |
| BRUCE HUMPHREY, | ) | |
| | ) | |
| Defendant. | ) | |

## REPORT AND RECOMMENDATION
## OF MAGISTRATE JUDGE

The above matter was referred to the undersigned United States Magistrate Judge

pursuant to 28 U.S.C. §636(b). The defendant Bruce Humphrey was charged in an indictment

with Felon in Possession of a Firearm.  Humphrey filed a Motion to Suppress Statements and

Evidence [Doc. 32] on April 27, 2012. In the motion, Humphrey contends that because police

officers did not have reasonable suspicion to stop and detain him, he was seized in violation of

the Fourth Amendment and therefore all statements and evidence should be suppressed.

After filing the motion, Humphrey moved for new counsel and to continue the

evidentiary hearing. Those motions were granted. After the continuances, the Government filed a

Response to Defendant's Pretrial Motions [Doc. 47].  The evidentiary hearing was held on July

23, 2012. Following the hearing, Humphrey submitted a Supplemental Memorandum of Law

Regarding His Motion to Suppress Evidence and Statements [Doc. 57] on July 31, 2012.  On

August 16, 2012, the Government submitted its Response to Defendant's Supplemental Motion

[Doc. 58].

The undersigned makes the following findings of fact and conclusions of law with regard to the suppression motions, based upon evidence adduced at the hearings, as well as a review of the transcript of the hearings, and briefs of the parties.

## FINDINGS OF FACT

Detectives Nicholas Martorano and Curtis Burgdorf of the City of St. Louis Police Department testified at the evidentiary hearing. The undersigned finds the testimony from both of the detectives credible. The detectives testified that at the time of Humphrey's arrest, they were working in the Special Operations Unit, which performs covert investigations of individuals suspected of criminal activity involving drugs or violence.

Detective Burgdorf testified that he began to investigate Humphrey following an incident on August 11, 2011. Detective Burgdorf stated that police officers responding to reports of a burglary and gunfire at a residence associated with Humphrey discovered drugs and money alongside some paperwork that appeared to belong to him. Humphrey was also a suspect in the September 2011, killing of a man named Ronnie Pleasant. The police believed that there was a "hit" out on Humphrey in retaliation for Pleasant's murder. At one point, Humphrey was arrested in connection with Pleasant's murder, but was released and not charged.

On February 29, 2012, Detective Burgdorf testified that he and his partner Detective Adam Duke were working on another assignment when they spotted a purple 1994 Lexus that they believed to be associated with Humphrey. Detective Burgdorf decided to follow the Lexus. He contacted Detective Martorano to help him with the surveillance. Detective Martorano testified that he was not assigned to the Humphrey case, and had only seen pictures of Humphrey. Operating in two separate unmarked vehicles, the detectives began to follow the Lexus one at a time while maintaining contact with each other. The detectives first followed the

Lexus to a school in the City of St. Louis, where they watched a child join two women in the car. They next followed the Lexus to a home on Elkins Drive in north St. Louis County, where the occupants of the car were greeted by a man who fit Humphrey's description. After watching the home for fifteen minutes, the man that Detective Martorano identified as Humphrey, left the home, entered the Lexus, and drove away.

The detectives then followed Humphrey for about twenty minutes before he arrived at the Buzz Westfall Plaza, a shopping center at the corner of West Florissant Road and Lucas and Hunt Road in St. Louis County. Detective Burgdorf followed Humphrey into the parking lot from an entrance on Lucas and Hunt Road. He watched as Humphrey parked the Lexus for less than a minute, and then drove towards the West Florissant Road side of the lot. At the same time, Detective Martorano entered the shopping center from West Florissant Road. Detective Martorano and Humphrey met at a four-way intersection near where Detective Martorano had entered. They briefly stopped directly across the intersection from each other. Detective Martorano then made a left turn into the parking lot for a bank and pulled behind the bank, pretending to be a customer. After appearing to continue forward, Humphrey made a sudden turn into the same lot, but stopped at the front of the bank. Believing that Humphrey had realized that Detective Martorano was following him, Detective Burgdorf called off the surveillance.

Detective Martorano then exited the bank parking lot and the shopping center, and began travelling westbound on West Florissant Road. Detective Burgdorf watched as Humphrey also left the parking lot and turned onto westbound West Florissant Road, several cars behind Detective Martorano. Both cars travelled in the right-hand lane on West Florissant for a short time before becoming stuck in traffic. Detective Burgdorf watched Humphrey change to the

empty left lane and pull forward until he was alongside Detective Martorano's car.  Humphrey

remained stopped there for five or ten seconds with no traffic in front of him.  Detective

Martorano testified that he saw movement inside the Lexus.  Detective Burgdorf, following from

behind, testified that he saw Humphrey raise his right arm briefly, but could not see whether

there was anything in Humphrey's hand.  Fearing for Detective Martorano's safety, he

immediately advised Detective Martorano to pull off the road into a nearby strip mall, which

Detective Martorano then entered through the east driveway.  Humphrey raced ahead of the

stopped traffic, made a right turn, and entered the strip mall through the west driveway.

Humphrey maneuvered his Lexus into Detective Martorano's path, so that the two vehicles were

nose to nose.

Detective Burgdorf followed Humphrey as he turned into the strip mall.  He stopped his

car behind Humphrey, boxing Humphrey in between the two unmarked police cars.  He testified

at the hearing that, in light of Humphrey's history and behavior, he was concerned that there

would be a violent confrontation.  Detective Burgdorf then turned on his police light and exited

the vehicle along with his partner.  They drew their weapons and verbally identified themselves

as police.  Humphrey rolled down his window and stuck his head partially outside.  He stated

that had not known that they were the police, and that he had believed that he was being

followed by somebody who meant to rob or kill him.  Detective Burgdorf continued to advance

toward Humphrey's window.  He then saw, through the partially opened window, a handgun

resting on Humphrey's lap.

Detective Burgdorf ordered Humphrey out of the Lexus and brought him to the back of

the Lexus, where he was, according to Detective Burgdorf's testimony, "secured."  Detective

Burgdorf then retrieved the firearm before informing Humphrey that he was under arrest.

Detective Burgdorf began to set out Humphrey's *Miranda* rights, but Humphrey interrupted, stating that he had been arrested before and knew his rights. Detective Burgdorf began to set out the *Miranda* rights a second time. Humphrey interrupted again to state that the gun did not belong to him.

## CONCLUSIONS OF LAW

In the motion to suppress, and during the evidentiary hearing, Humphrey argued that the arresting police detectives did not have a reasonable suspicion sufficient to justify an investigative stop under *Terry v. Ohio*, 391 U.S. 1 (1968), rendering the evidence seized as a result of the encounter between Humphrey and the detectives inadmissible. The government argues that Humphrey initiated the encounter, not the police. In the Response to Defendant's Supplemental Memorandum, the Government argues that Humphrey actually detained the police.

### A. Basis for *Terry* Stop

"The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const. amend. IV. For the purposes of the Fourth Amendment, "whenever a police officer accosts an individual and restrains his freedom to walk away, he has 'seized' that person," even if a traditional arrest does not take place. *Terry v. Ohio*, 391 U.S. 1, 16 (1968). "[A] person has been 'seized' within the meaning of the Fourth Amendment only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *California v. Hodari D.*, 499 U.S. 621, 627-28 (1991) (quoting *United States v. Mendenhall*, 446 U.S. 544, 555 (1980) (opinion of Stewart, J.) (citing *Terry*, 391 U.S. at 19)). A seizure may be effectuated either by "the slightest application of physical force" or by a subject's submission to a "show of

authority." *United States v. Pratt*, 355 F.3d 1119, 1122 (8th Cir. 2004) (citing *Hodari D.*, 499 U.S. at 625, 628-29).

Here, the seizure occurred when Humphrey submitted to a show of authority. First, Detective Burgdorf used his vehicle to box in Humphrey by positioning his car behind Humphrey's, which was already blocked in front because of the position of Detective Martorano's vehicle. Next, Detective Burgdorf activated his emergency lights. Detectives Burgdorf and Duke then exited their vehicle, drew their weapons, and yelled that they were the police. These actions would have given a reasonable person the impression that he or she was not free to leave. *See United States v. Johnson*, 326 F.3d 1018, 1021-22 (8th Cir. 2003) ("Some circumstances that inform the determination of whether a seizure took place include: officers positioning themselves in a way that limits the person's freedom of movement, . . . the display of weapons by officers, . . . [and] the use of language or intonation indicating compliance is necessary.") (internal citation omitted). Humphrey submitted to this show of authority by acknowledging that Detectives Burgdorf and Duke were police officers, remaining inside his vehicle, and not attempting to flee even though Detective Martorano's car moved out of Humphrey's way.

To the extent that the Government is arguing that Humphrey's actions in confronting officers after they stopped the surveillance is an argument that the encounter began consensually, and therefore implicated no Fourth Amendment concerns until Humphrey was arrested, it fails because the circumstances indicate that it rose to the level of a seizure well before that point. *See United States v. Perez-Sosa*, 164 F.2d 1082, 1084 (8th Cir. 1998) ("A consensual encounter becomes a seizure when a reasonable person in the same circumstances would not feel free to leave.") (citing *United States v. Hathcock*, 103 F.3d 715, 718 (8th Cir. 1997)); *United States v.*

*Villa-Gonzalez*, 623 F.3d 526, 532 (8th Cir. 2010) (a different formulation of the same proposition).

Having established that a seizure occurred, the next question is whether it violated the Fourth Amendment. "A law enforcement officer may conduct an investigative stop of a vehicle if the officer has a reasonable suspicion supported by articulable facts that criminal activity may be afoot." *United States v. Robinson*, 670 F.3d 874, 876 (8th Cir. 2012) (quoting *United States v. Sokolow*, 490 U.S. 1, 7 (1989), in turn quoting *Terry*, 392 U.S. at 30) (internal quotations omitted). Courts "consider the totality of the circumstances when determining whether an officer has a particularized and objective basis to suspect wrongdoing." *Id.* (citing *United States v. Arvizu*, 534 U.S. 266, 273 (2002)).

According to Detective Burgdorf's testimony, the purpose of Humphrey's seizure was to ensure the safety of Detective Martorano and his partner. Detective Burgdorf watched Humphrey follow Detective Martorano's car into the Westfall Center parking lot, and again follow Detective Martorano's car along West Florissant. He watched Humphrey pull alongside Detective Martorano, and possibly raise his arm. He watched Humphrey pull around traffic in order to block Detective Martorano's car in the strip mall parking lot. Further, Detective Burgdorf knew that Humphrey was a convicted felon and a murder suspect. Under these circumstances, it was objectively reasonable for Detective Burgdorf to suspect that Humphrey meant to confront, and potentially harm, Detective Martorano and his partner. The seizure was therefore justified as a *Terry* stop.

### B.     The *Terry* Stop Did Not Escalate to an Arrest Before Probable Cause Was Established

While the encounter began as a *Terry* stop, it is undisputed that it ended with Humphrey's arrest. An arrest – formal or *de facto* – requires probable cause, whereas a *Terry* stop requires a

lesser justification, though it is limited in scope. *See United States v. Newell*, 596 F.3d 876, 879 (8th Cir. 2010).

"After making an otherwise lawful *Terry* stop, an officer may conduct an investigation 'reasonably related in scope to the circumstances which justified the interference in the first place.'" *United States v. Garcia*, 646 F.3d 1061 (8th Cir. 2011) (quoting *United States v. Banks*, 553 F.3d 1101, 1105 (8th Cir. 2009), in turn quoting *Terry*, 392 U.S. at 20). "An investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop." *United States v. Mendoza*, 677 F.3d 822, 828 (8th Cir. 2012) (quoting *United States v. Bloomfield*, 40 F.3d 910, 915 (8th Cir. 1994) (*en banc*)). "[W]here an officer exceeds the permissible scope of *Terry,* the investigatory detention is transformed into an arrest." *United States v. Aquino*, 674 F.3d 918, 924 (8th Cir. 2012) (citing *United States v. Maltais*, 403 F.3d 550, 556 (8th Cir. 2005) and *Peterson v. City of Plymouth*, 945 F.3d 1416, 1419 (8th Cir. 1991)).

The circumstance justifying the *Terry* stop was the reasonable suspicion that Humphrey meant to do harm to Detective Burgdorf and his partner. The stop was short, and focused on neutralizing the threat that the detectives believed Humphrey posed. It did not go beyond that purpose until Humphrey's gun was discovered. Nor was the *Terry* stop transformed into an arrest by the detectives' show of force. In determining whether police conduct transforms a *Terry* stop into an arrest, a court considers the following factors:

> (1) the number of officers and police cars involved, (2) the nature of the crime and whether there is reason to believe the suspect is armed, (3) the strength of the officer's articulable, objective suspicions, (4) the need for immediate action by the officer, (5) the presence or lack of suspicious behavior or movement by the person under observation, and (6) whether there was an opportunity for the officer to have made the stop in less threatening circumstances.

*Peterson*, 945 F.2d at 1419-20 (quoting *United States v. Seelye*, 815 F.2d 48, 50 (8th Cir. 1987)) *see also Aquino*, 674 F.3d at 924 (citing *Peterson* for the factors).

Here, two detectives sought to detain a convicted felon who had maneuvered his vehicle in a way that would cause a reasonable person to fear that he meant to do harm to an undercover police officer. While they may have had a basis to stop Humphrey earlier, the detectives instead attempted to terminate their surveillance twice before Humphrey's conduct forced them to take action. In light of these circumstances, it was reasonable for Detectives Burgdorf and Duke to box in Humphrey and draw their weapons in order to prevent any harm to Detective Martorano and his partner. Drawing their weapons was also a reasonable step to protect their own safety. *See United States v. Bell*, 480 F.3d 860, 864 (8th Cir. 2007) ("During any investigative stop, 'officers may take steps reasonable necessary to protect their personal safety.'") (quoting *United States v. Shranklen*, 315 F.3d 959, 961). Therefore, the detectives did not exceed the original scope of the *Terry* stop before finding the gun.

Humphrey's gun was found in plain view. "It is settled that an officer, without a warrant, may seize an object in plain view provided the officer is lawfully in the position from which he or she views the object, the object's incriminating nature is immediately apparent, and the officer has a lawful right of access to the object." *United States v. Darr*, 661 F.3d 375, 379 (8th Cir. 2011) (quoting *United States v. Bustos-Torres*, 396 F.3d 935, 944 (8th Cir. 2005)). "Neither exigency nor inadvertence is an element of the plain view doctrine." *PPS, Inc. v. Faulkner Cnty.*, 630 F.3d 1098, 1106 (8th Cir 2011) (citing *Horton v. California*, 496 U.S. 128, 137-38 (1990)). These requirements were satisfied here. First, Detective Burgdorf acted lawfully in standing next to Humphrey's car after making a valid *Terry* stop. *See United States v. Beatty*, 170 F.3d 811, 814 (8th Cir. 1999). It was from that vantage point that he saw Humphrey's gun. Second, the incriminating character of the gun was apparent given Humphrey's prior felony conviction. Third, the discovery of a gun under these circumstances justified a limited search of

the vehicle in order to recover it.  *See United States v. Coleman*, 148 F.3d 897, 904 (8th Cir. 1998) (citing *United States v. Richards*, 967 F.2d 1189, 1193 (8th Cir. 1992)).  All three requirements of the plain view doctrine are thus satisfied.  The discovery and recovery of Humphrey's gun did not violate the Fourth Amendment.

Finally, the discovery of the gun created probable cause to believe that Humphrey, a convicted felon, had committed a crime.  "Probable cause exists if the facts and circumstances within the arresting officers' collective knowledge 'are sufficient to warrant a prudent person, or one of reasonable caution, in believing . . . that the suspect has committed, is committing, or is about to commit an offense.'"  *United States v. Taylor*, 519 F.3d 832, 834 (8th Cir. 2007) (quoting *United States v. Brown*, 49 F.3d 1346, 1349 (8th Cir. 1995)) (omission in original).  Here, a known felon was found with a gun in his car.  That fact alone is sufficient to create a reasonable belief that Humphrey possessed a firearm in violation of 18 U.S.C. § 922(g)(1).  Because Humphrey was arrested on probable cause in a public place, the detectives were not required to obtain a warrant.  *United States v. Watson*, 423 U.S. 411, 414-24 (1976).  The arrest was therefore valid under the Fourth Amendment.

## CONCLUSION

The undersigned concludes that Humphrey was validly detained under *Terry v. Ohio*.  By the time the *Terry* stop escalated to an arrest, there was probable cause to believe that Humphrey had committed a crime.  Because the Fourth Amendment was not violated, it does not provide a basis upon which to exclude evidence obtained as a result of the encounter between Humphrey and the detectives.

**IT IS HEREBY RECOMMENDED** that the Motion to Suppress Statements and Evidence [Doc. 32, Doc. 57] be **DENIED.**

The parties are advised that they have fourteen (14) days in which to filed written objections to this report and recommendation pursuant to 28 U.S.C. §636(b)(1).  Failure to timely file objections may result in a waiver of the right to appeal questions of fact.

Dated this <u>11th</u> day of September, 2012.

.

_____/s/ Nannette A. Baker_____
NANNETTE A. BAKER
UNITED STATES MAGISTRATE JUDGE
